INDUSTRIAL SITING COUNCIL OF the
STATE OF WYOMING, Appellant
(Respondent),

v.

CHICAGO AND NORTH WESTERN
TRANSPORTATION COMPANY and
Western Railroad Properties, Inc., Appellees (Petitioners).

No. 5740.

Supreme Court of Wyoming.

March 8, 1983.

Peter J. Mulvaney, Deputy Atty. Gen., Walter Perry, III, Senior Asst. Atty. Gen., and John D. Erdmann, Asst. Atty. Gen., signed the briefs, and Erdmann appeared in oral argument for appellant.

Craig Newman and Morris R. Massey of Brown, Drew, Apostolos, Massey & Sullivan, Casper, and Christopher A. Mills, Chicago, Ill., an atty. in good standing, Bar of Ill., signed the brief and Mills appeared in oral argument for appellees.

Before ROONEY, C.J.,* RAPER, THOMAS and BROWN, JJ., and FORRISTER, District Judge.

ROONEY, Chief Justice.

Appellees-petitioners, Chicago and North Western Transportation Company and its wholly owned subsidiary, Western Railroad Properties, Inc. (hereinafter C & NW), filed an application for a certificate of insufficient jurisdiction with appellant-respondent, the Industrial Siting Council of the State of Wyoming (hereinafter ISC), to exempt C & NW's planned railroad construction project from the permit requirements of the Industrial Development Information and Siting Act, § 35–12–101 et seq., W.S.1977, Cum. Supp.1982. After a public hearing, the ISC denied C & NW's application and C & NW appealed to the district court. The district court reversed, holding that the Interstate Commerce Act, specifically 49 U.S.C. § 10901, pre-empted the jurisdiction of the ISC with regard to C & NW's planned railroad construction project.

On appeal from the decision of the district court, the ISC raises the following issues:

* Became Chief Justice on January 1, 1983.

"I.   DOES THE WYOMING INDUS-
     TRIAL SITING ACT EMPOWER
     THE SITING COUNCIL TO REG-
     ULATE IN AREAS OUTSIDE
     THE FIELD OF CONCERN OF
     THE I.C.C. [Interstate Commerce
     Commission]?

"II.  DOES THE INTERSTATE COM-
     MERCE ACT, IN PARTICULAR
     49 U.S.C. § 10901, PREEMPT
     THE  INDUSTRIAL  SITING
     ACT?

"III. DOES THE EXERCISE OF CON-
     CURRENT      JURISDICTION
     OVER MATTERS OF STATE OR
     LOCAL CONCERN BY THE SIT-
     ING COUNCIL CONFLICT WITH
     THE ORDERS OF THE I.C.C.?"

In addition, we must address the question of whether or not the district court had jurisdiction to entertain the appeal.

We find that the district court had jurisdiction and we affirm the holding of the district court.

## FACTS

Pursuant to § 3(a) through (f) of the Industrial Development Information and Siting Rules and Regulations (1981), C & NW filed an application for a certificate of insufficient jurisdiction with the ISC for its planned construction and operation of a railroad line to transport low-sulfur coal from the eastern Powder River Basin to a connecting point with the Union Pacific railroad line at Joyce, Nebraska. The estimated cost of the Wyoming construction is $112,804,874, in mid-1981 dollars. The plan includes:

(1) The construction of a wye at Shawnee Junction, near Orin Junction, to connect the C & NW and Burlington Northern railroad line running north to the Powder River Basin with C & NW's present east-west line;

(2) The reconstruction of C & NW's east-west line which parallels U.S. Highway 20 from Shawnee Junction east to Crandall, near Van Tassell;

(3) The construction of a new connector line from Crandall south in Wyoming crossing into Nebraska east of Torrington and then to Joyce, Nebraska; and

(4) The construction of a microwave communication system and support facilities for the project.

In 1976 the Interstate Commerce Commission (hereinafter I.C.C.) issued a certificate of public convenience and necessity to Burlington Northern, Inc. and C & NW authorizing the construction of the joint line between Shawnee Junction and the Powder River Basin coal fields. In connection with its issuance of a certificate of public convenience and necessity, the I.C.C. caused an environmental impact statement to be prepared. As a result of the statement, the I.C.C. imposed mitigating conditions on the issuance of the certificate. See Burlington Northern, Inc. and Chicago and North Western Transportation Company—Construction and Operation—Between Gillette and Douglas, in Campbell and Converse Counties, Wyoming, 348 I.C.C. 388 (1976). The construction of the wye at Shawnee Junction would complete the construction authorized by the I.C.C. in 1976.

In 1978 C & NW filed an application with the Federal Railroad Administration to finance its interest in the joint line and to upgrade 519 miles of its existing line east from Shawnee Junction.[1] This proposal did not satisfy the Federal Railroad Administration and C & NW was requested to explore alternatives. C & NW's planned railroad line construction project resulted. In connection with C & NW's application for financial assistance from the Federal Railroad Administration, another environmental impact statement covering the planned railroad line construction was prepared. Chicago and North Western Transportation Company Construction and Operation of a Line of Railroad in Niobrara and Goshen Counties, Wyoming and in Sioux and Scotts Bluff Counties, Nebraska, 363 I.C.C. 906 (1981), aff'd sub nom. *Mobil Oil Corporation v. Interstate Commerce Commission,* 685 F.2d 624 (1982).

---

1. C & NW has withdrawn its application for   financial assistance.

Over a period of time, C & NW filed a complex series of applications with the I.C.C. concerning the joint line authorized in 1976, the construction of the connector line, and the transactions necessary to obtain financing for the project. The environmental impact statement prepared by the Federal Railroad Administration covering the planned railroad line construction was used by the I.C.C. in considering C & NW's applications. The I.C.C. approved, with conditions, the joint line agreement between C & NW and Burlington Northern, Inc. and approved the construction of the connector line subject to certain mitigating measures covering the construction of both the connector line and C & NW's existing line between Shawnee Junction and Crandall, which measures resulted from consideration of the environmental impact statement. Chicago and North Western Transportation Company Construction and Operation, supra.

The ISC recognizes that the I.C.C. has authorized the construction of the planned project but contends that it is not precluded from imposing additional requirements on C & NW's planned construction. C & NW contends that the ISC authority with regard to the planned construction has been pre-empted by the Interstate Commerce Act and/or the I.C.C. approval of the planned construction project. However, preliminary to reaching these contentions, we must determine whether the district court had jurisdiction to entertain C & NW's appeal from the denial of the certificate of insufficient jurisdiction by the ISC.

## JURISDICTION

" * * * The first and fundamental question on every appeal is that of jurisdiction; this question cannot be waived; it is open for consideration by the reviewing court whenever it is raised by any party, or it may be raised by the court of its own motion. [Citation.]" *Gardner v. Walker*, Wyo., 373 P.2d 598, 599 (1962). And see *Matter of Various Water Rights in Lake DeSmet*, Wyo., 623 P.2d 764, 767 (1981); *Mountain West Farm Bureau Mutual Insurance Company v. Hallmark Insurance Company*, Wyo., 561 P.2d 706, 708–709 (1977).

Because of the separate procedure established by the ISC to determine whether or not it has jurisdiction over a given construction project, we must determine whether or not there is statutory authority to review the ISC decision and, if there is statutory authority, whether or not the ISC decision is ripe for judicial review.

By rule the ISC has created a procedure apart from the permit process by which its jurisdiction over the construction of an industrial facility[2] may be challenged. Under it, the ISC jurisdiction may be challenged by filing an application for a certificate of insufficient jurisdiction pursuant to § 3(a), Ch. 1 of the Industrial Development Information and Siting Rules and Regulations (1981).[3] Rather than contest the ISC jurisdiction during the permit process established by the Industrial Development Information and Siting Act, supra, C & NW availed itself of this separate procedure in addition to filing an application for a permit, and it appealed the ISC denial of its application for a certificate of insufficient jurisdiction to the district court.

■ The right to judicial review of an administrative decision is entirely statutory. Said another way, judicial review is not available unless made so by statute. Where judicial review is available, the legislature must clearly express its intent in order to preclude judicial review. *United States*

---

**2.** For the definition of "facility" as the term is used in the Industrial Development Information and Siting Act, supra, see § 35–12–102(a)(iii), W.S.1977, Cum.Supp.1982.

**3.** Section 3(a), Ch. 1, of the Industrial Development Information and Siting Rules and Regulations (1981) provides:

"a. Any person who intends to construct any industrial facility may submit to the Office an application for a certificate of insufficient jurisdiction which shall state that the proposed facility intended to be constructed does not qualify as an industrial facility under the Act, and that the Council lacks sufficient jurisdiction to require that an application for a permit to construct be submitted."

*Steel Corporation v. Wyoming Environmental Quality Council,* Wyo., 575 P.2d 749, 750 (1978).

The Industrial Development Information and Siting Act, *supra,* provides for the review of the ISC final decision on a permit application and of a decision issued after a hearing on an application for a permit, but is silent concerning the review of a decision on an application for a certificate of insufficient jurisdiction. Section 35–12–115, W.S. 1977. Therefore, the only other statute possibly providing for judicial review of such decision is § 9–4–114(a), W.S.1977,[4] which provides in pertinent part:

"(a) Subject to the requirement that administrative remedies be exhausted and in the absence of any statutory or common-law provision precluding or limiting judicial review, *any person aggrieved or adversely affected in fact* by a final decision of an agency in a contested case, or *by other agency action or inaction,* or any person affected in fact by a rule adopted by an agency, *is entitled to judicial review in the district court * * *.*" (Emphasis added.)

And see Rule 12.01, W.R.A.P.

■ This appeal is not from an agency decision rendered in a contested case, nor is it from the application of an agency rule. Therefore, in order to be appealable, pursuant to § 9–4–114(a), *supra,* it must come within the "other agency action or inaction" language of that section and Rule 12.01, W.R.A.P. See: *Diefenderfer v. Budd,* Wyo., 563 P.2d 1355 (1977); and *Thornley v. Wyoming Highway Department, Motor Vehicle Division,* Wyo., 478 P.2d 600 (1971). It does. The ISC by rule separated the jurisdictional question from the permit process and rendered a decision denying C & NW's application for a certificate of insufficient jurisdiction. C & NW was aggrieved or adversely affected by that decision and was entitled to judicial review in the district court.

The ISC would have us hold otherwise, arguing that the pre-emption question raised by C & NW before the ISC and on appeal to the district court is not ripe for judicial review until the separate ISC permit process is complete and the ISC permit is issued with conditions. The ripeness doctrine is a category of justiciability "developed to identify appropriate occasions for judicial action." 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3529, p. 146 (1975). The basic rationale of the ripeness requirement, like that of the justiciability requirement,

" * * * is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

In *Brimmer v. Thompson,* Wyo., 521 P.2d 574, 578 (1974), we set out the necessary elements of a justiciable controversy, quoting at length from *Sorenson v. City of Bellingham,* 80 Wash.2d 547, 496 P.2d 512, 517 (1972), as follows:

" ' * * * First, a justiciable controversy requires parties having existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon

4. The Wyoming Administrative Procedure Act was moved from Title 9 to Title 16, effective January 1, 1983. Ch. 62, S.L. of Wyoming. 1982. In this opinion, we will refer to the provisions of the Act as they appeared in Title 9.

the rights, status or other legal relationships of one or more of the real parties in interest, *or, wanting these qualities be of such great and overriding public moment as to constitute the legal equivalent of all of them.* Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues. Any controversy lacking these elements becomes an exercise in academics and is not properly before the courts for solution.' (Emphasis supplied.)"

In this case the ISC has established a separate procedure which may be utilized to challenge its jurisdiction over a given construction project. This procedure was followed to its completion and resulted in a formal order denying C & NW's application for a certificate of insufficient jurisdiction. No further administrative action is contemplated on the decision. It is final. The decision of the ISC requires C & NW to complete the permit process and pay the costs associated with the permit process. See §§ 35–12–108(b) and 35–12–110(a), W.S.1977. Failure to do so will in all likelihood result in the imposition of severe civil penalties. See: § 35–12–119, W.S.1977.

Both parties have an existing and genuine interest in the controversy. C & NW seeks to avoid the permit process of the Industrial Development Information and Siting Act; the ISC seeks to impose the permit process on C & NW. Our decision will operate to terminate the controversy and will determine the rights and legal relationships between the parties vis-a-vis the necessity of C & NW obtaining a permit prior to construction. Finally, these proceedings are genuinely adversary. The issues are fit for judicial resolution and there is no reason for us to withhold our consideration.

## PRE–EMPTION

The ISC contends on appeal that the district court erred in finding that it is pre-empted from acting with regard to C & NW's planned railroad construction project by § 10901, 49 U.S.C., of the Interstate Commerce Act. The ISC argues that its authority to consider and mitigate environmental, social, and economic impacts of the construction project does not conflict with the I.C.C.'s authority over interstate railroad construction projects and that Congress has not directly or indirectly occupied the field. C & NW contends that there is an actual conflict between the Interstate Commerce Act and the Industrial Development Information and Siting Act and that Congress has evidenced its intent to occupy the field of interstate railroad construction.

At the outset it is appropriate to note what this case does not involve. It does not involve a challenge of state legislation based on the dormant power given Congress by the Commerce Clause, Art. I, § 8, United States Constitution, where Congress has not acted. See: *Southern Pac. Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) and the cases discussed therein. Rather, Congress has acted and we must determine the interrelationship between state and federal power because of that action.

When Congress exercises its power under the Commerce Clause, supra, a state's power to legislate in the same area may be limited by the Supremacy Clause of the United States Constitution, Art. VI, which provides in pertinent part:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The United States Supreme Court recently set out the standard to be used in determining whether or not a state law has been pre-empted by a federal statute or regulation in *Chicago & North Western Transportation Company v. Kalo Brick & Tile Company,* 450 U.S. 311, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981).

"Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). See *De Canas v. Bica,* 424 U.S. 351, 356, 96 S.Ct. 933, 936, 47 L.Ed.2d 43 (1976). The underlying rationale of the pre-emption doctrine, as stated more than a century and a half ago, is that the Supremacy Clause invalidates state laws that 'interfere with, or are contrary to, the laws of Congress . . . .' *Gibbons v. Ogden,* 9 Wheat. 1, 211, 6 L.Ed. 23 (1824). The doctrine does not and could not in our federal system withdraw from the States either the 'power to regulate where the activity regulated [is] a merely peripheral concern' a federal law, *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 243, 79 S.Ct. 773, 778, 3 L.Ed.2d 775 (1959), or the authority to legislate when Congress could have regulated 'a distinctive part of a subject which is peculiarly adapted to local regulation . . . but did not,' *Hines v. Davidowitz,* 312 U.S. 52, 68, n. 22, 61 S.Ct. 399, 405, n. 22, 85 L.Ed. 581 (1941). But when Congress has chosen to legislate pursuant to its constitutional powers, then a court must find local law pre-empted by federal regulation whenever the 'challenged state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971), quoting *Hines v. Davidowitz,* supra, at 67–68, 61 S.Ct., at 404. Making this determination 'is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict.' *Perez v.*

*Campbell,* supra, at 644, 91 S.Ct., at 1708. And in deciding whether any conflict is present, a court's concern is necessarily with 'the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.' *San Diego Building Trades Council v. Garmon,* supra, at 243, 79 S.Ct., at 778."

Pursuant to the power granted it by the Commerce Clause, supra, Congress has enacted a comprehensive regulatory scheme covering interstate common carriers, including railroads. Interstate Commerce Act, 49 U.S.C. § 10101 et seq.[5] It has been the source of numerous pre-emption questions over the years. More often than not, state attempts to impose obligations on interstate common carriers have been invalidated as "plainly inconsistent with the plenary authority of the Interstate Commerce Commission or with congressional policy as reflected in the [Interstate Commerce] Act." *Chicago & North Western Transportation Company,* supra, 101 S.Ct. at 1130. As stated in *Chicago & North Western Transportation Company,* supra, 101 S.Ct. at 1131:

" * * * The common rationale of these cases [invalidating state imposed obligations on interstate commerce] is easily stated: '[T]here can be no divided authority over interstate commerce, and . . . the acts of Congress on that subject are supreme and exclusive.' *Missouri Pacific R. Co. v. Stroud,* 267 U.S. 404, 408, 45 S.Ct. 243, 245, 69 L.Ed. 683 (1925). Consequently, state efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity."

Congress has granted the I.C.C. broad power to regulate interstate railroad construction, acquisition and operation of an extended or additional railroad line. Section 10901 of 49 U.S.C. provides in pertinent part:

---

**5.** The Interstate Commerce Act was codified in 1978 as Subtitle IV of Title 49. Pub.Law 95–473, 92 Stat. 1337 et seq. (1978). The provisions governing railroads with which we are concerned in this case were added to the Inter-

state Commerce Act by the Transportation Act of 1920, ch. 91, 41 Stat. 477. See: *Chicago & North Western Transportation Company,* supra, 101 S.Ct. at 1131.

"(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title [49 USCS §§ 10501 et seq.] may—

"(1) construct an extension to any of its railroad lines;

"(2) construct an additional railroad line;

"(3) acquire or operate an extended or additional railroad line; or

"(4) provide transportation over, or by means of, an extended or additional railroad line;

"only if the Commission finds that the present or future public convenience and necessity require or will be enhanced by the construction or acquisition (or both) and operation of the railroad line.

 *  *  *  *  *  *

"(c)(1) If the Commission—

"(A) finds public convenience and necessity, it may—

"(i) approve the application as filed; or

"(ii) approve the application with modifications and require compliance with conditions the Commission finds necessary in the public interest; or

"(B) fails to find public convenience and necessity, it may deny the application.

"(2) On approval, the Commission shall issue to the rail carrier a certificate describing the construction or acquisition (or both) and operation approved by the Commission."[6]

In *Transit Commission v. United States,* 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075 (1933), the United States Supreme Court discussed the authority of a state to regulate the terms of an agreement between two railroads to jointly use railroad facilities. In finding that state regulation of the terms of the agreement covering an "extended or additional railroad" line was preempted by the Interstate Commerce Act, the Supreme Court noted that the Transportation Act of 1920, from which 49 U.S.C. § 10901, supra, fn. 5, comes, was intended to cure the detrimental effects of multiple regulation on interstate railroad transportation and the public interest. The Supreme Court held that federal regulation must be

" * * * construed to make federal authority effective to the full extent that it has been exerted and with a view of eliminating the evils that Congress intended to abate. [Citations.]" *Transit Commission,* supra, 289 U.S. at 128, 53 S.Ct. at 538.

See: *Chicago & North Western Transportation Company,* supra, 101 S.Ct. at 1131; *Alabama & Vicksburg Railway Company v. Jackson & Eastern Railway Company,* 271 U.S. 244, 46 S.Ct. 535, 70 L.Ed. 928 (1926); and *Board of Administration v. Chicago, B. & Q. R. Co.,* 138 Kan. 720, 27 P.2d 550 (1933). The power of the I.C.C. over railroad extensions is plenary. Transit Commission, supra, 53 S.Ct. at 538. The same conclusion has been reached with regard to the I.C.C.'s authority to regulate the abandonment of railroad lines.[7] It is exclusive. *Chicago & North Western Transportation Company,* supra, 101 S.Ct. at 1132; and *Colorado v. United States,* 271 U.S. 153, 46 S.Ct. 452, 455, 70 L.Ed. 878 (1926).

■ Thus, the I.C.C.'s authority to regulate the construction, extension and operation of interstate railroad lines is exclusive.

■ The Industrial Development Information and Siting Act, supra, confers on the ISC the authority to regulate the construction of facilities[8] through a permit process. A permit must be obtained prior to beginning construction, § 35–12–106, W.S.1977, or the person may be subject to substantial civil penalties, § 35–12–119, W.S.1977. By virtue of a 1981 amendment

---

**6.** Prior to the 1978 codification, § 10901, 49 U.S.C., was contained in 49 U.S.C. § 1(18). Cases prior to 1978 refer to § 1(18). The codification did not change the provisions of § 1(18) concerning construction.

**7.** Both railroad line construction or extension and railroad line abandonments were covered under 49 U.S.C. § 1(18) prior to the 1978 codification. Abandonments are now covered by 49 U.S.C. §§ 10903 through 10906.

**8.** See fn. 2, supra.

to § 35–12–121(e), W.S.1977, Cum.Supp. 1982, the exemption for railroad construction was removed, thereby subjecting C & NW's planned railroad line construction to the permit requirements of the Industrial Development Information and Siting Act, supra. See: Ch. 127, § 1, S.L. of Wyoming 1981.

The ISC is empowered to grant the permit for construction of a facility, grant the permit with conditions to mitigate the adverse effects of the construction or deny the permit by § 35–12–114, W.S.1977, which provides in pertinent part:

"(a) Within sixty (60) days of completion of hearing the council shall make complete findings, issue an opinion and render a decision upon the record, either granting or denying the application as filed, or granting it upon such terms, conditions or modifications of the construction, operation or maintenance of the facility as the council may deem appropriate. The council shall grant a permit either as proposed or as modified by the council if it finds and determines:

"(i) The nature of the probable environmental impact is acceptable, including a specification of the predictable adverse effect on the normal environment, public health and safety, aesthetics, scenic, historic and recreational value, forest and parks, air quality, water supply and quality, fish, wildlife and agricultural resources;

"(ii) That by the design and location of the facility, any adverse environmental impact is reduced to the extent deemed acceptable considering:

"(A) The state of available technology;

"(B) The nature and economics of the various alternatives;

"(C) Preservation of historic sites, forest and parks, fish and wildlife, air quality, water supply and quality, agriculture resources and land areas possessing sensitive ecological conditions; and

"(D) Other pertinent considerations.

"(iii) That the facility is compatible with the public health and safety;

"(iv) That the facility is compatible with the state, intrastate regional, county and local land use plans, if any, and with existing and projected nearby land utilization;

"(v) That the facility is designed in compliance with applicable state and local laws and regulations issued thereunder, except that the council may refuse to apply any local law or regulation if it finds that, as applied to the proposed facility, such law or regulation is unreasonably restrictive in view of the existing technology, or of factors of cost or economics;

"(vi) That the department of environmental quality has determined that the proposed facility or cumulative effects intensified by the facility will not violate state and federally established standards and implementation plans. The judgments of the department are conclusive on all questions related to the satisfaction of state and federal standards;

"(vii) That the facility represents an acceptable impact upon the environmental, social and economic well being of the municipality and people in the area where the facility is proposed to be located, considering the factors enumerated in W.S. 35–502.81(a)(xii) [§ 35–12–108(a)(xii)].

"(b) No permit shall be granted if:

"(i) The estimated emissions or discharges of the proposed facility will exceed state or federal standards, either individually or because of the cumulative effect with other sources;

"(ii) The location of the facility conflicts with or violates state, intrastate regional, county and local land use plans;

"(iii) The cumulative effect of the facility on the environmental, social and economic conditions in the area in conjunction with other facilities will substantially impair the health, safety and welfare of people even though paragraph (i) of this subsection is not applicable.

"(c) If the council determines that the location of all or part of the proposed facility should be modified, it may condition its permit upon such modification, provided that the local governments, and persons residing therein, affected by the modification, have been given reasonable notice of the modification."

This pervasive regulatory scheme was enacted to protect Wyoming's environment and the social and economic fabric of the communities affected by industrial development.[9] It gives the ISC the power to control or prohibit the construction of facilities, such as C & NW's planned railroad line construction project.

The ISC stresses the emphasis of the Industrial Development Information and Siting Act, supra, on the mitigation of social and economic impacts of a planned construction project, rather than on the power of the ISC to deny a construction permit. The ISC apparently concedes that it cannot block C & NW's planned railroad line construction project which has been authorized by the I.C.C. See Burlington Northern, Inc. and Chicago and North Western Transportation Company—Construction and Operation, supra, 348 I.C.C. 388; and Chicago and North Western Transportation Company—Construction and Operation, supra, 363 I.C.C. 906. However, it argues that it may impose conditions, in addition to the conditions already imposed by the I.C.C., on the construction project.

We cannot agree. As noted above, Congress has granted the I.C.C. pervasive authority over the construction, extension and operation of interstate railroad lines. Environmental impact statements are mandated in connection therewith[10] and were accomplished in this instance. The Industrial Development Information and Sitting Act purports to give the ISC authority to grant or deny permits for the construction of interstate railroads. This imposition of addition-al obligations by the Industrial Development Information and Siting Act cannot stand. To hold otherwise would reimpose the burden of multiple regulation which Congress intended to abolish. Transit Commission, supra. Regulation of the construction, extension and operation of interstate railroad lines by the Industrial Development Information and Siting Act, supra, is pre-empted by the Interstate Commerce Act, 49 U.S.C. § 10901, supra, under the Supremacy Clause of the United States Constitution, Art. VI.

The ISC has placed a great deal of emphasis on the factors it must consider in passing on an application for a construction permit, § 35–12–111, W.S.1977, as contrasted to the factors considered by the I.C.C. in granting a certificate of public convenience and necessity pursuant to the National Environmental Policy Act, supra, fn. 10, in an attempt to circumscribe an area within which it has power to regulate C & NW's planned railroad line construction project. However, nothing was left to the states. Therefore, we need not address the issues raised by the ISC concerning the extent of federal pre-emption. Federal pre-emption in the domain of interstate railroad line construction is complete.

The decision of the district court is affirmed.

---

9. For a general discussion of Wyoming's industrial siting legislation see Van Baalen, "Industrial Siting Legislation: The Wyoming Industrial Development Information and Siting Act—Advance or Retreat?" 11 Land & Water L.Rev. 27 (1976).

10. Preparation of environmental impact statements are mandated by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.