CITY OF EVANSTON, Wyoming, a municipal corporation; Town of Lyman, Wyoming, a municipal corporation; Town of Mountain View, Wyoming, a municipal corporation; and Uinta County, Wyoming, a body politic; and State of Wyoming ex rel., City of Evanston, Wyoming, a municipal corporation; Town of Lyman, Wyoming, a municipal corporation; Town of Mountain View, Wyoming, a municipal corporation; and Uinta County, Wyoming, a body politic, Petitioners/Relators and Plaintiffs,

v.

James B. GRIFFITH, Auditor of the State of Wyoming and Stan Smith, Treasurer of the State of Wyoming, Respondents/Defendants.

No. 85–103.

Supreme Court of Wyoming.

March 21, 1986.

Mark W. Harris, Evanston (argued), for City of Evanston.

Thomas F. Mealey, Evanston, for Town of Lyman.

Bruce R. Barnard, Evanston, for Town of Mountain View, and Larry M. Donovan, Evanston, for Uinta County.

A.G. McClintock, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., and Mary B. Guthrie, Senior Asst. Atty. Gen. (argued), for respondents/defendants.

Before THOMAS, C.J., and ROSE,* ROONEY,** BROWN, and CARDINE, JJ.

CARDINE, Justice.

This case was certified to this court from the district court pursuant to Rule 12.09, W.R.A.P. It involves a decision by the state auditor and treasurer to withhold impact assistance funds from the City of Evanston. We must decide whether those funds must be paid under §§ 39-6-411(c) and 39-6-512(d), W.S.1977 (May 1985 Replacement) even though the industrial facility to which the funds relate did not receive a permit until after construction commenced. We hold that the funds must be disbursed.

On August 7, 1981, Amoco Production Company began construction of a natural gas processing facility in Uinta County. Amoco failed to obtain a permit before commencing construction as required by § 35-12-106(a), W.S.1977 of the Industrial Development Information and Siting Act.[1]

Amoco finally applied to the Office of Industrial Siting Administration for a permit on July 13, 1983. An evidentiary hearing was held before the Industrial Siting Council (Council) and, on March 12, 1984, the Council issued findings of fact, conclusions of law, and an order granting Amoco the permit. In its fourth conclusion of law, the Council created a retroactive date for the permit:

"As a result of the construction commencing on the central production facility pursuant to Air Quality Permit No. CT-391 on August 7, 1981, the Council concludes that the permit issued in this matter shall be effective as of August 7, 1981, and that the permit conditions established by this Order shall be effective as of the date of execution of this Order and the permit."

The permit itself also included the retroactive date:

"This permit is issued effective August 7, 1981, and shall remain in force throughout the useful life of the facility. The conditions and stipulations of this permit shall become effective as of the date of execution hereof."

The decision of the Council was not appealed or collaterally attacked by the State. Instead, this dispute arose when the City of Evanston requested the state treasurer to pay impact assistance funds to the City based on the August 7, 1981 commencement of plant construction. The treasurer paid the impact assistance monies that accrued after March 12, 1984, the date upon which the Council issued the Amoco permit, but refused to make payments covering the period from August 7, 1981 to March 12, 1984. The City filed a claim for $3,201,511.82, the amount withheld, and the treasurer formally denied it.

---

* Retired November 1, 1985.

** Retired November 30, 1985.

1. Section 35-12-106(a), W.S.1977, states in part: "No person shall commence to construct a facility, as defined in this act, in the state without first having obtained a permit issued with respect to such facility by the [Industrial Siting] council."

If a person violates the permitting requirement, he is subject to civil penalties of up to $10,000 and further construction can be enjoined. Section 35-12-119(b) and (d), W.S.1977. There is no dispute in this case that the gas processing plant was an industrial facility that had to be permitted under the Act and that Amoco could have been fined or enjoined from further construction; but, no fine was ever levied and no injunction sought.

The City next attempted to compel payment by filing in district court a combined petition for a writ of mandamus, petition for review and complaint requesting declaratory judgment.[2] The court held a hearing and decided that the case should be certified directly to this court under Rule 12.09, W.R.A.P., which states:

"If after such review, the district court concludes the matter to be appropriate for determination by the Supreme Court, the district court may certify the case to the Supreme Court." [3]

## PLAIN MEANING

The two statutes at issue in this case, §§ 39-6-411(c) and 39-6-512(d), W.S.1977 (May 1985 Replacement), are part of the sales and use tax distribution structure.[4] They create a mechanism by which extraordinary sales and use tax revenues collected during boom times are returned to the counties of collection for impact assistance. Both statutes are identical in their relevant terms, providing:

"If any person commences after the effective date of this act to construct an industrial facility, as that term is defined in W.S. 35-12-102(a), under a permit issued pursuant to W.S. 35-12-106, * * * the state treasurer shall thereafter pay to the county treasurer * * * impact assistance payments from the monies available under W.S. 39-6-411(b)(i) [or W.S. 39-6-512(b)(i)]."

The State contends that the state treasurer is not authorized to make payments under these statutes for construction that takes place before a permit has actually been issued. According to the State, construction does not commence "under a permit issued pursuant to W.S. 35-12-106" just because a permit is eventually issued with an effective date covering the entire construction period.

The City, on the other hand, argues that construction commences "under a permit issued pursuant to W.S. 35-12-106" as long as a permit is eventually issued and dated to correspond to the actual commencement of construction. The City claims, in effect, that the status of a project is not frozen at the time construction takes place. Its status as permitted or unpermitted can be retroactively changed by the issuance of a permit that relates back to the date of actual construction.

It is clear from these arguments that the key statutory clause is, "under a permit issued pursuant to W.S. 35-12-106." We must decide whether construction of Amoco's natural gas processing plant was commenced "under a permit issued pursuant to W.S. 35-12-106" although the retroactively dated permit was issued after the actual commencement of construction.

Ironically, both parties argue that the statute is so clear that we need not resort to any rules of statutory construction. They both implore us to interpret the stat-

**2.** It was proper for the City to file for these forms of relief from agency inaction under Rule 12.12, W.R.A.P., which states:

"The relief, review, or redress available * * * in actions for a declaratory judgment of rights, status, or legal relations based on administrative action or inaction, in actions for mandamus to compel administrative action * * * shall be available by independent action notwithstanding any petition for review filed."

**3.** This case is properly before us under Rule 12.09, W.R.A.P. The petition for review was filed within the 30-day time limit of Rule 12.04, W.R.A.P., and the district court held a hearing on the petition before deciding that the matter was appropriate for certification. We note that appellant's alternative claims for mandamus and declaratory relief joined with his petition for review may not be properly certifiable to

this court under Rule 12.09 which seems to restrict certification to petitions for review. In any event, the case was properly certified on the petition for review, and our determination on that petition will be conclusive of the issues raised in the alternative claims for mandamus and declaratory relief.

**4.** Sections 39-6-411(c) and 39-6-512(d) were added to the sales and use tax structures in 1981 and amended in 1983 and 1985, but none of the portions crucial to this appeal have changed. Wyoming Session Laws 1981, ch. 145, § 1; Wyoming Session Laws 1983, ch. 184, § 1. The 1981 versions began with the word "whenever" rather than the word "if," an insignificant difference in context. We will refer to the 1985 version in this opinion even though the case arose under its predecessors.

ute according to contradictory "plain meanings." We do not believe that the statute is as clear as the parties claim.

We think that the critical phrase of the statute is ambiguous because it is "uncertain and susceptible to more than one meaning." *Attletweedt v. State*, Wyo., 684 P.2d 812, 814 (1984). The statute does not tell us under what circumstances construction should be held to have commenced under a permit issued pursuant to § 35–12–106. Perhaps it commences "under a permit" only if the permit is issued beforehand. Perhaps, on the other hand, construction has commenced "under a permit" as long as the permit is dated to correspond to the first day of actual construction. We must turn to the applicable rules of statutory construction to make that determination. *Attletweedt v. State*, supra, at 814.

### STATUTORY CONSTRUCTION

"In construing statutes, legislative intent is the primary consideration. If the language is sufficiently clear, there is no need to resort to rules of construction. When the language is not clear or is ambiguous, the court must look to the mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of law, and other prior and contemporaneous facts and circumstances, making use of the accepted rules of construction to ascertain a legislative intent that is reasonable and consistent." *State ex rel. Motor Vehicle Division v. Holtz*, Wyo., 674 P.2d 732, 736 (1983).

The aids to construction outlined in *Holtz*, supra, are not always helpful because we do not have published legislative debates, committee reports and other legislative materials at our disposal in this state. In the case at bar, however, we do have the luxury of a comprehensive act, closely related to the statutes at issue, to which we can turn.

The Industrial Development Information and Siting Act (Siting Act) was passed by the legislature in 1975 and has been amended several times since its passage. The statutory subsections at issue in this case, while not passed as one of these amendments, are nevertheless linked to the Siting Act because they refer explicitly to Siting Act provisions. Both §§ 39–6–411(c) and 39–6–512(d) apply when "industrial facilit[ies]" as "defined in W.S. 35–12–102(a)" are constructed and when permits are "issued pursuant to W.S. 35–12–106." We will rely heavily on the Siting Act in our analysis because

"[a]ll statutes relating to the same subject or having the same general purpose must be read as constituting one law, and, where possible, should be harmoniously construed in order to avoid conflicting and confusing results." *Johnson v. Safeway Stores, Inc.*, Wyo., 568 P.2d 908, 913 (1977).

The Siting Act is designed to protect Wyoming's environment and the social and economic fabric of its communities from the mischiefs resulting from massive, unregulated industrial development. *Industrial Siting Council of Wyoming v. Chicago and North Western Transportation Company*, Wyo., 660 P.2d 776, 784 (1983); L. MacDonnell, Regulating Socioeconomic Impacts: Comparing the Colorado and Wyoming Approaches, 20 Land & Water L.Rev. 193, 202–203 (1985); J. Van Baalen, Industrial Siting Legislation: The Wyoming Industrial Development Information and Siting Act—Advance or Retreat?, 11 Land & Water L.Rev. 27, 99–100 (1976). One way to provide the needed protection is to force developers to mitigate impacts through the construction of physical facilities such as housing, schools, or sewers. Developers can also be forced to grant financial aid directly to the communities impacted. Section 35–12–114, W.S.1977, allows the Council to condition the issuance of an industrial siting permit on a developer's agreement to finance needed mitigation measures. The Council has employed this mechanism, often at the suggestion of local community leaders. L. MacDonnell, supra, at 205.

The statutes at issue in this case, §§ 39–6–411(c) and 39–6–512(d), are also mitigation measures and should be inter-

preted to advance the same purposes as the mitigation mechanisms in the Siting Act itself. But, it is hard to see how the impact assistance funding statutes can be given the State's interpretation and still help communities mitigate impacts.[5] Funds are necessary to finance mitigation measures, such as roads, sewers, schools, and additional police protection when a large project is constructed, regardless of when the Council graces the developer with a permit. Yet, according to the State, the community must forfeit impact assistance funds until a permit is issued. We think the City's interpretation of the impact assistance statutes is far more likely to cure the mischiefs at which the statutes are aimed. When the Council grants a permit which is retroactively dated to the first day of construction, that construction should be held to have commenced "under a permit" and the state treasurer should pay impact assistance funds covering the entire period during which construction was "under a permit."

The State contends that neither the City of Evanston, Amoco, nor the Council attempted to apply the permitting process before construction because they did not think the plant would fall under the Siting Act's jurisdictional provisions.[6] In its brief, the State argues:

"[T]he strong inference must be drawn that no one thought the facility was a project which came under the jurisdiction of the Siting Council, or perhaps a cynic could conclude that Amoco preferred not having to comply with the standards of the Industrial Siting Council. Conse-

quently, it could be argued that if the project was not subject to any of the Council's requirements and scrutiny, then financed benefits should [not] flow to the entities in Uinta County. If Amoco was not subject to the 'pervasive' regulatory requirements of the Industrial Siting Act, then the legislative message is that no impact assistance funds should be distributed to political subdivisions in Uinta County."

█ We find the State's proposed interpretation to be both unreasonable and inconsistent with the general purpose of the Siting Act. The State is essentially saying that a community waives its right to impact assistance if the community leaders mistakenly assume that the project falls outside the Act. The State is also saying that a community should lose its impact funds if an industry tries to avoid the Act's requirements. It is impossible to square these contentions with the purpose of impact assistance.

█ While it is true that the legislature intended the impact assistance statutes to benefit only communities impacted by facilities above a certain minimum size, it does not follow that those benefits should be withheld based on the developer's or the community's initial projections. Benefits should be linked to the actual size of the project because the actual size, not the apparent size, controls the level of community impact.

There is nothing in the Act which indicates that the legislature wanted to withhold benefits from impacted communities based on pre-project assumptions. Section

---

**5.** The dissenters quote the Council's findings of fact to show that the City of Evanston will receive a windfall if the treasurer is forced to pay the sales and use tax revenues. But, it is hard to see how the findings quoted by the dissenters support that conclusion. If anything is shown by the Council's findings, it is that the City felt it needed the sales and use funds to mitigate impacts. In finding number 11(e)(2), quoted by the dissent, the City and Amoco agreed that "[t]here may be future needs related to [the project]." And in finding number 11(e)(3), the City and Amoco identified many specific areas of current need created by population growth which was, in turn, attributable to an influx of project workers. Finally, the City

stated that it was not asking for any assistance from the Council *other than through Amoco's participation in OIA and the sales and use tax paid to the State for impact assistance since August, 1981 * * *.* Instead of showing that payment of the sales and use revenues would create a windfall, this final statement in the agreement between the City and Amoco shows that the City needed and expected the very funds withheld by the state treasurer.

**6.** Industrial facilities are defined in § 35–12–102(a)(iii), W.S.1977, as those facilities above certain energy generating or conversion capacities or above certain estimated construction costs.

35–12–119(a)(i), W.S.1977 (May 1985 Replacement), which penalizes developers who proceed without a permit, does not punish the communities who are impacted by unauthorized projects. Instead, this penal provision benefits impacted communities by forcing developers to comply with the Act's many permitting requirements that protect target communities. We think that §§ 39–6–411(c) and 39–6–512(d), W.S.1977 (May 1985 Replacement) should be interpreted consistently with the general protective purpose of the Siting Act. We would be ignoring this legislative purpose if we interpreted these statutes to punish a community just because a developer fails to obtain a permit.

One additional rule of statutory construction set forth in *State ex rel. Motor Vehicle Division v. Holtz*, supra, 674 P.2d at 736, is:

> "When the language [of a statute] is not clear or is ambiguous, the court must look to * * * the historical setting surrounding its enactment * * *."

The historical setting surrounding the enactment of §§ 39–6–411(c) and 39–6–512(d) in 1981 supports our construction of those statutes. Wyoming Session Laws 1981, ch. 145, § 1. At the time of enactment, Wyoming was undergoing an energy development boom, and communities were staggering under heavy impacts caused by increased construction. It is likely that the legislature intended these statutes to be construed broadly and flexibly so that communities would obtain the financing necessary to mitigate impacts. We doubt that the legislature intended that funds be withheld in the face of actual impact simply because the Council issued a late permit.

Our holding should not produce any of the dire consequences raised by the State and the dissent. The Council was not required to issue a permit, much less a retroactive permit, in this case. In addition, the office of Industrial Siting Administration (Office) could have sought an injunction to prevent plant operation or could have fined Amoco up to $10,000 per day for its failure to get a permit in advance of construction. These remedies are sufficient to protect the permitting requirement without penalizing the citizens who live in impacted communities. No developer would knowingly risk large sums of money on a project if that project might be enjoined from operation or saddled with a fine of $10,000 per day. And, most developers will seek a permit prior to construction because additional requirements by other governmental agencies are barred after a permit is issued. Section 35–12–116, W.S.1977.

 It is hard to see how penalizing the City of Evanston and its citizens would strengthen the permitting requirement. The developer, not the City, must apply for the permit and the Council, not the City, must decide whether it should issue. If a developer proceeds without a permit, it is the Office, not the City, that is empowered to initiate statutory sanctions.[7] Finally, the Siting Act does not require cities to conduct independent investigations into industrial projects or to withhold local zoning or land use approval when the state requirements are violated. The City of Evanston can hardly be faulted for its failure to somehow enforce the permitting requirement in this case when the Council decided that the belated permit should be issued and the Office decided that the statutory violations should be overlooked.[8]

---

7. Section 35–12–119, W.S.1977, creates a somewhat vague procedure for enforcement of sanctions against developers who fail to obtain permits before they begin construction. The statute does not say who decides when statutory fines should be imposed, but it does indicate that violations ripe for injunctive relief should be identified by the Office and referred to the attorney general. As one might expect, the attorney general brings the actual civil actions when necessary.

8. The dissenters argue that there is no statutory authority which allows the Council to issue a permit with a retroactive date. We disagree. Section 35–12–114(d), W.S.1977, gives the Council broad authority to set commencement times on its construction permits. It states in part: "If the council decides to grant a permit for the facility, it shall issue the permit embodying the terms and conditions in detail, *including the time specified to commence construction,* which time shall be determined by the council's decision as to the reasonable capa-

There is one final issue that we mention only in passing. The State argues in its brief that the auditor has an independent duty to look into state expenditures to make sure that they comply with statute. The City responds that neither the auditor nor treasurer can withhold payments that have been authorized by another state agency, in this case the Council. We need not address this issue because, under our interpretation of the critical statutes, the disputed funds are properly payable to the City of Evanston and must be paid.

Remanded to the district court for entry of an order consistent with this opinion.

THOMAS, Chief Justice, dissenting, with whom ROONEY, Justice, joins.

Reluctantly, I must dissent from the disposition of this case according to the majority opinion. I have concluded that what undoubtedly must be a popular result involves the institution of bad policy. The only way to avoid that unfortunate result that I am able to discern is to uphold the position of the state auditor and state treasurer.

Because of the perceived inequity of the circumstances insofar as local government is concerned, the following quotation of the findings of fact by the Industrial Siting Council (hereinafter Council in accordance with § 35–12–102(a)(ii), W.S.1977) is pertinent:

"11. e. The Council finds that the City of Evanston agreed with Amoco as follows:

"(1) There are no currently identified unmet needs related to the Anschutz Ranch East in Evanston;

"(2) There may be future needs related to Anschutz Ranch East in Evanston;

"(3) There are current needs related to population growth and demographic change in Evanston that have not been resolved. Specifically the following have been identified: (a) water development, (b) fire department satellite facility and equipment, (c) computer management system, (d) water, sewer, and transportation planning, (e) development of undeveloped park lands, (f) storm water master plan implementation, (g) redevelopment and implementation of urban renewal plan, (h) expansion of city hall, (i) completion of implementation of management system;

"(4) The City of Evanston is not at this time, other than through Amoco's participation in the OIA and the sales and use tax paid to the State for impact assist-ance since August, 1981, asking for any assistance from the ISC as a result of the Anschutz Ranch East permit application."

This agreement apparently concedes no impact prior to the hearing held in December of 1983.

While I agree that there does appear to be a parallel legislative purpose with respect to the impact assistance payments made from sales and use tax collected and with respect to the authority of the Council to require impact assistance from the developer of an industrial facility, I do note that in this instance the City of Evanston agreed with the developer that there had, as yet, been no impact in fact. The City did not request impact assistance directly from Amoco for prior impact. As the majority concedes, developers can be required to pay impact funds to the communities. Consequently, the claims of the City of Evanston for retroactive impact assistance payments under the tax portion of the statute appear to be designed to achieve a windfall for the City of Evanston rather than to compensate it for any otherwise unmet prior need.

I have no difficulty in concluding that the statutory language in this instance is clear

---

bility of the local government, most substantially affected by the proposed facility, to implement the necessary procedures to alleviate the impact." (Emphasis added.)
The only statutory limit on the Council's power to set a commencement time in its permit is the requirement that impacted local governments

be given a chance to alleviate impacts. Ironically, the dissenters' narrow interpretation of this statute would penalize the very local governments that the statute was designed to protect. We think the statute can be fairly interpreted to provide ample authority for the issuance of a retroactive permit.

and unequivocal. It requires a person to commence to construct an industrial facility under a permit issued pursuant to statute. Amoco did not commence to construct an industrial facility under a permit issued pursuant to statute on August 7, 1981. It is clear from the record that the permit was issued March 12, 1984, and I am satisfied that for our purposes that was the date on which Amoco commenced to construct an industrial facility under a permit. In § 35–12–102(a)(viii), W.S.1977, as amended (1985 Cum.Supp.), the following definition appears:

" 'Commence to construct' means:

"(a) Any clearing of land, excavation, construction or other action which would affect the environment of the site of any facility, * * *."

Construction subsequent to March 12, 1984, indeed could affect the environment of the site of this facility and consequently would meet the statutory definition of commence to construct although a permit application at that late date certainly would justify the invocation of the statutory penalties found in § 35–12–119, W.S.1977.

It is provided in § 35–12–119, W.S.1977 that whenever the state office of industrial siting administration (hereinafter Office in accordance with § 35–12–102(a)(i), W.S. 1977) determines that a person, as defined in the statute, is violating any of the provisions of this section, it shall refer the matter to the attorney general for further action. In this instance that mandatory provision of the statute apparently was not followed, and it would appear that the Office and the Council pursued a settlement of the matter without involving the attorney general. The only purpose I can discern for the retrospective action in this instance is to inhibit the imposition of the fines and penalties provided in § 35–12–119, W.S.1977, and perhaps to preserve the impact assistance payments for the benefit of the City of Evanston and others.

The majority of the court approves the retrospective action by the Council in the issuance of a permit. My reading of the Industrial Development Information Siting Act, §§ 35–12–101, et seq., W.S.1977, as amended, leads me to the conclusion that the legislature intended prospective action by the Council. The purpose and intent of this act is to require the study and consideration of certain statutory topics before, not after, the industrial facility is commenced. For example, § 35–12–114(c), allowing the Council to change the location, and § 35–12–108(a)(iii), requiring the applicant to estimate the commencement date, both contemplate that construction will begin after the permit is issued.

This tacit approval of retrospective action by the Office and Council is not sound administrative law.

"The general rule is that only those powers expressly conferred by the legislature are granted to an administrative agency. *McNeil v. Park County School District No. 1*, Wyo., 635 P.2d at 818 (1981); *Tri-County Electric Association, Inc. v. City of Gillette*, Wyo., 525 P.2d 3 (1974); *Bruegman v. Johnson Ranches Inc.*, Wyo., 520 P.2d 489 (1974)." *Brasel & Sims Construction Co., Inc. v. State Highway Commission of Wyoming*, Wyo., 655 P.2d 265, 267 (1983).

The majority disposition in this case not only supplies the authority to act retrospectively which is not explicitly afforded by statute to the Council, but it seems to approve action by the Office and the Council which the statute specifically ascribes to the office of the attorney general. The approval by this court of the retrospective action by the Council in this instance essentially permits a waiver of the statutory penalties by the Council and the Office, when those penalties and other remedies obviously are to be pursued and waived, if they are to be waived, by other state or county officials.

My main difficulty with the majority position is that it adopts a legal fiction or perhaps more precisely a fiction of law structured by the Council. Black's Law Dictionary (5th ed.1979) teaches that a legal fiction is an:

"Assumption of fact made by court as basis for deciding a legal question. A situation contrived by the law to permit a court to dispose of a matter, though it

need not be created improperly; *e.g.* fiction of lost grant as basis for title by adverse possession." Id. at p. 804.

The same source defines a fiction of law as:

"An assumption or supposition of law that something which is or may be false is true, or that a state of facts exists which has never really taken place. An assumption, for purposes of justice, of a fact that does not or may not exist. A rule of law which assumes as true, and will not allow to be disproved, something which is false, but not impossible. *Ryan v. Motor Credit Co.*, 30 N.J.Eq. 531, 23 A.2d 607, 621.

"These assumptions are of an innocent or even beneficial character, and are made for the advancement of the ends of justice. They secure this end chiefly by the extension of procedure from cases to which it is applicable to other cases to which it is not strictly applicable, the ground of inapplicability being some difference of an immaterial character." Id. at p. 562, 23 A.2d 607.

I see the invocation of the legal fiction that the commencement of the construction of the industrial facility involved in this case was under a permit issued pursuant to the statute not as innocent or beneficial (except to the appellants) but fraught with peril in terms of the legislative intent relating to the proper functioning of the statutory scheme.

I find the statutory language in this instance to be clear. It is clear from the record that in the absence of the invocation of a fiction of law, the statutory requirements were not met until March 12, 1984. I find it to be bad policy to encourage retrospective action by the Council. That encouragement can have only the effect of encouraging those who are developing industrial facilities to fail to comply with the statute and wait and see what happens. What happened in this case involves a usurpation by the Office and the Council of statutory prerogatives assigned to other officials. All of these effects, although concededly necessary to a popular and, some would claim equitable, result in this case are contrary to the legislative intent as I perceive it. I would uphold and confirm the position of the state auditor and state treasurer to the end that these unhappy policy effects would not receive the approval of this court.